UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | |
| | : | Case Number: 20MJ 174 |
| **GLEN BOND** | : | |
| | : | Detention Hearing: September 10, 2020 |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF
## PRETRIAL DETENTION OF DEFENDANT GLEN BOND

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in support of its request that defendant Glen Bond be detained pending the trial of this matter pursuant to 18 U.S.C. §§ 3142(f)(1)(A) and (d)(1)(A)(iii). The offense involved is a crime of violence. The defendant has been charged by Criminal Complaint in the District of Columbia with one count of Attempt Transportation for the Promotion or Facilitation of Prostitution, in violation of 18 U.S.C. § 2421(a), and Interstate and Foreign Travel of Transportation in Aid of Racketeering Enterprises, in violation of 18 U.S.C. § 1952(a)(3). An analysis of the factors set forth in 18 U.S.C. § 3142(g) below leads to the conclusion that detention is appropriate because there is no condition or combination of conditions that will reasonably assure the safety of any person and the community.

## FACTUAL BACKGROUND

On August 12, 2020, an online covert employee ("OCE") assigned to the Federal Bureau of Investigation ("FBI")/Metropolitan Police Department ("MPDC") Child Exploitation and Human Trafficking Task Force ("CEHTTF") portrayed being a 20-year-old female that lived in Washington, D.C. utilizing a an online social media platform known to law enforcement to be a

site where individuals involved in the commercial sexual exploitation of women attempt to recruit women and girls to work as prostitutes for their financial benefit.[1]

In this capacity, the OCE was contacted by user "Mr. Hollywood," later identified as GLEN BOND, with a date of birth of August 6, 1971 (herein the "DEFENDANT"), on August 12, 2020. He stated, "SEXY I GOT A LOT GOING ON OVER HERE AND IN NY I AM LOOKING FOR A DOWN ASS BITCH THAT LIKE GETTING MONEY LIKE I SAID I WANT YOU." The DEFENDANT's social media account had a biography that stated, "IM ABOUT GETTING MONEY IF ITS NOT ABOUT MONEY THEN IT MAKE NO SINCE TO ME!!!" The account also had numerous pictures of large amount of cash, messages that referenced making money, numerous pictures of different women at parties and stripper events, and messages that referenced sexual activity and operating a commercial sex enterprise. For example:

A picture of a green road sign that stated, "Fucking and Sucking, Next Exit 1 Mile."

A post which stated, "I only fuck wit bitches I can win with."

A post of large stacks of cash, with the message, "IM ON MY GRIND."

A post that stated, "Stop living the renegade[2] life and Choose and real P."[3]

Advertisement for "The Official Players Ball." [4] The advertisement is cropped and there are no details about the date or location of the event.

---

[1] The name of this social media application is known to law enforcement. It is being withheld to protect the integrity of ongoing investigations.

[2] Renegade is a term used to describe a female involved in commercial sex that is operating on her own and does not have a pimp.

[3] The letter P is used to refer to Pimp

[4] The Players Ball is an event gathering of pimps, held in various location across the country.

A picture of large amount of cash with the message "PIMP" and a crown.[5]

On August 27, 2020, the OCE responded to the DEFENDANT and provided a phone number, The DEFENDANT sent the OCE a text message from phone number (973)862-9496. After some initial text message communication, a confidential human source ("CHS") spoke with the DEFENDANT on the phone.[6] During the call, the DEFENDANT stated that he wanted to be" blunt" and that the CHS would be having sex with clients. The DEFENDANT said that he has girls in hotels, strip clubs, and "street walkers" in the New York area. The DEFENDANT stated that New York is the only place where everything is open and CHS could make very good money. The DEFENDANT said that the CHS would stay with him and his other girls at his residence. The DEFENDANT told the CHS that she would be his "boss bitch" and would be trained to be run the other girls.

The CHS asked the DEFENDANT about whether she would she be wearing condoms when she met with clients. The DEFENDANT responded that she would be wearing condoms all the time, and that her safety was important to him. The CHS asked what would happen if she got caught by the police. The DEFENDANT explained that "prostitution" is a misdemeanor and usually it gets dropped down to a fine but he would help her with that. The DEFENDANT stated he would be able to provide a phone for her and get it set up. The DEFENDANT stated he would

---

[5] Crowns are used by pimps and signify that are kings of their operation.

[6] While the OCE attempted to record this call, the recorder malfunctioned and did not record the call. The OCE did listen to the entirety of the call as it was taking place and took notes on the substance shortly after it ended.

3

put the application "Life360,"[7] on it so that he would be able to track her wherever she was. The CHS asked about how much money she would be able to keep. The DEFENDANT replied that when they collect the money up for the night, she would be taken care of and be able to save some of the money or send some back home. The DEFENDANT did not provide a percentage or dollar amount the CHS would be able to keep. After the phone call, the conversation continued via text message on the same day:

> DEFENDANT: So we good baby
>
> OCE: Yea. I will u let u know
>
> DEFENDANT: Ok baby
>
> DEFENDANT: You ok baby how was your thinking process going?
>
> OCE: Good. Just thinking of some logistics with my aunt.
>
> OCE: I've been helping her out, so just want to make sure she is good
>
> DEFENDANT: Will like i said i got you all the way baby
>
> <Conversation continued later that same day>
>
> OCE: Have u been doing this a long time?
>
> DEFENDANT: Ok baby do what you have to do. And yes i gave been doing that for a long. Time and i am good at what i do baby
>
> DEFENDANT: Also let me say i will do everything in my power to make and keep you happy
>
> DEFENDANT: I want you to tell me that i am your and your pussy is for me to keep happy and good that is what i want you to say to me sexy

---

[7] Life 360 is a family social networking application that allows members to know the location of other users who are lined as family members on the application.

4

OCE: Sounds good to me

DEFENDANT: It's all good baby like i said i got you

OCE: 😊

DEFENDANT: Don't take too long baby

OCE: I won't

DEFENDANT: OK

On August 28, 2020, the OCE told the DEFENDANT that a friend was interested and asked if she would be able to come too. The DEFENDANT replied, "Send me a picture of her but ya she would able to get down as long as she knows what she's getting into so send me a picture of her." After sending a picture of an Undercover Covert Employee ("UCE"), the conversation continued:

OCE: We can both make good money, right?

DEFENDANT: Absolutely

DEFENDANT: That's if you both listen to me and follow what I say yes we can make a lot of money

DEFENDANT: I will show you how not to want for nothing and we can have everything

DEFENDANT: So are going to be my ride or die bitch no matter what?

OCE: I think so

OCE: I think my friend a little worried about getting std but I told her that we always wear condoms. Like u said

OCE: Maybe u can make her feel better about it

DEFENDANT: I'll will talk to her

On August 29, 2020, a UCE, posing as the friend, had a recorded phone conversation with the DEFENDANT. The UCE initially stated she was concerned with getting a sexually transmitted

5

disease. The DEFENDANT interrupted her and asked if he could be "blunt." The DEFENDANT stated they he "laid out several things to her (meaning the CHS) and she preferred the street walker thing. It's easier. Faster. And more money." The UCE asked what street walker meant and the DEFENDANT described it as "walking corner to corner, stopping cars. Everything is done with a condom. I don't care how much money somebody offers you, your safety is my concern." The DEFENDANT continued that he was going to be out on the street with them and would be teaching them what to do, from what to say to how to interact with the clients.

The DEFENDANT stated, "prostitution is the lowest thing on the totem pole in the city of New York. That's a desk ticket or appearance ticket. The police for the last 8 months have been letting the girls work. When you get out there you will see there is almost anywhere from 20 to 30 girls out there doing the same thing you gonna be doing." The DEFENDANT continued, "You are my girls. You understand me. You don't ask no one else but me. My job is to make sure we get from point A to point B, we get our money, and come back home. Nobody gives up free pussy or nothing like that. Just to keep it 100,[8] the only one who gets free pussy is me. You understand me." The DEFENDANT continued, "I know for a fact that we are going to make a lot of money." The DEFENDANT asked the UCE if she "suck a dick good," and had a "good pussy." The UCE replied that she had not had any complaints. The DEFENDANT stated, "the object of this is do it fast, make them nut,[9] get out so you can catch the next date." The DEFENDANT said that girls can make from $500-$1000 a night but explained that he will be regularly collecting the money from them. The DEFENDANT continued, "I'm going to teach you how to stay in pocket with them

---

[8] 100 is a slang term for being honest.

[9] "Nut" is a slang term for orgasm,
6

other pimps that's out there. If you follow my instruction, you will be better off. You will be good and no will fuck with you. Everyone will know, Hollywood has in pocket girls. In pocket means they follow the rules."

The UCE asked the DEFENDANT about an application "her friend' said that the DEFENDANT would put on her phone. The DEFENDANT stated he will put the "360" application on her phone, so that he will always know her location. The UCE then asked if she would get an allowance, and the DEFENDANT replied that all the money comes to him first. The DEFENDANT stated that if she needed money to send home, do her nails or hair, or get something from the store, he will take care of it. The DEFENDANT continued, "Yall don't have nothing to worry about, just to make the money. My job is to take care of everything else."

After the phone call, the DEFENDANT continued talking to the OCE via text message and asking her if she had made a decision yet. He agreed to drive from New Jersey to Washington, D.C. to pick up the purported females to engage in prostitution. They agreed the DEFENDANT would drive down to Washington, D.C. on September 3, 2020. On August 31, 2020 the conversation continued:

> OCE: Thinking about coming to NYC. What should I bring? How long will i there?
> DEFENDANT: Bring. The most sexy and the most provocative sexy mini skirts and short-shorts whatever else you need will get it while you down here okay baby. Baby
> OCE: Ok
> DEFENDANT: Join my Life360 Circle! Use my invite code CQH-XOC. Download the app here: https://i.lf360.co/hhoFSGBLp9
> DEFENDANT: Hook that up to your phone baby
> OCE: Going to need ur help with that I think

7

> OCE: I got a Nokia phone and that app doesn't seem to be working
>
> DEFENDANT: GM baby Ok going to get you a new phone ASAP
>
> OCE: Thanks. This phone sucks

Throughout the next few days, the DEFENDANT continued to check in with the OCE to ensure she was still planning to come to be his "bitch." On September 3, 2020, the DEFENDANT confirmed that he would be driving to Washington, D.C. to pick up the purported female. The DEFENDANT stated it was about a 4 hour drive. The conversation continued:

> OCE: U taking us right back to NY when u get us, right?
>
> DEFENDANT: No we going to stop at the crib first get yourself situated let y'all freshen up have a talk with y'all and then we out to go get money okay baby
>
> OCE: Crib in NJ
>
> DEFENDANT: Yes

On September 3, 2020, at approximately 1:00 pm, the DEFENDANT stated he was getting on the highway. During the next few hours, the DEFENDANT sent updated pictures of himself driving in Delaware and Maryland. At approximately 6:45 pm, a black Dodge Journey, bearing New Jersey license plate "H WOOD," entered the parking lot of the prearranged location of Ivy City Motel, 1615 New York Avenue, Northeast, Washington, D.C. At the same time, the DEFENDANT text messaged the OCE to come out. The OCE replied that she was in room 116 and the vehicle then parked directly in front of the room. Members of MPDC Fifth District Crime Suppression Team and CEHTTF approached the vehicle and placed the DEFENDANT, who was

8

in the driver's seat, under arrest.

The DEFENDANT was taken back to the station, advised of his rights, and agreed to answer question without having an attorney present. The DEFENDANT stated he was only coming down to Washington, D.C. to engage in prostitution with the purported females. The DEFENDANT admitted to meeting the purported female on social media and exchanging text messages with her. The DEFENDANT admitted to talking on the phone with both purported females. The DEFENDANT denied that he was a pimp, and stated that he had no intention of having the purported females work for him in prostitution. The DEFENDANT admitted that he had discussed putting the Life360 application on the female's phone but it was for their safety. The DEFENDANT stated he was a party promoter and described himself as being the "hype man." The DEFENDANT denied ever having any females engage in prostitution for him.

Further investigation reveals that that the DEFENDANT has been involved in the commercial sex industry as far back as 2008. During the period from 2008-2009 and again in 2013 the FBI conducted surveillance of the defendant in both New Jersey and Pennsylvania. It was surmised from witness/victim interviews as well as surveillance that the DEFENDANT maintained a home of five to seven adult women and girls under the age of eighteen who engages in commercial sex for his benefit. This commercial work included sex acts in cars near his home in Pennsylvania as well as travel to New York City for the same purpose. At all times, victims made clear that all profits from commercial sex were for the DEFENDANT's sole benefit. This modus operandi was in line with the DEFENDANT's explanation of his enterprise to the undercover in this D.C. based operation.

9

**APPLICABLE LEGAL STANDARD**

The Bail Reform Act permits a judicial officer to hold an individual without bond pending trial if the officer finds clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Pursuant to 18 U.S.C. § 3142(f)(1)(A), the judicial officer shall hold a hearing on the question of detention upon the motion of the government in a case that involves a crime of violence. A crime of violence is defined to include "any felony under chapter….117." 18 U.S.C. § 3156(a)(4)(C).

The crime of Travel to Promote or Facilitate Prostitution, in violation of Title 18 United States Code Section 2421(a) is a felony offense under chapter 117 and, as such, is a crime of violence that under 18 U.S.C. § 3142(e)(2) creates a rebuttable presumption that the defendant constitutes a danger to the community, and that no pretrial release condition or combination of conditions may be imposed to assure the safety of any other person and the community. This presumption "operate[s] at a minimum to impose a burden of production on the defendant to offer some credible evidence contrary to the statutory presumption." *United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985) (observing that the presumptions in § 3142(e) "are rebutted when the defendant meets a burden of production by coming forward with some evidence that he will not flee or endanger the community if released").

In determining whether the defendant has overcome that presumption, the Court must consider the following factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be

posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Even when the defendant has offered evidence to rebut the presumption of dangerousness, the presumption remains a factor in the court's analysis of the § 3142(g) factors. *See United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1983) ("Use of that word [rebutted] in this context is somewhat misleading because the rebutted presumption is not erased. Instead it remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)."). As the Sixth Circuit has observed, "[t]he presumption [of dangerousness] remains as a factor because it is not simply an evidentiary tool designed for the courts. Instead, the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945-46 (6th Cir. 2010) ("To rebut the presumption, therefore, a defendant should 'present all the special features of his case' that take it outside 'the congressional paradigm.'").

## ANALYSIS

For the reasons that follow, the government submits that that the defendant cannot rebut the presumption that he shall remain detained, as there is no condition or combination of conditions that will reasonably assure the safety of any other person and the community.

### A. Nature and Circumstances of the Charged Offense

This factor clearly favors detention, since, as stated above, the offense is a crime of violence. The Defendant engaged in a persistent course of conduct designed to persuade the undercover into traveling across state lines to engage in commercial sex work for his own financial gain. The world of commercial sexual exploitation is extremely dangerous. Studies have shown that women who are engaged in prostitution experience violence ranging from slapping and punching to assaults with deadly weapons and rape. *See* Dalla, R. (2000, November). *Exposing*

*the "pretty woman" myth: A qualitative examination of the lives of female streetwalking prostitutes*. The Journal of Sex Research, 37(4), 344-353 (In a study of prostituted women, 72.1 % reported severe abuse at the hands of pimps, male sexual buyers, or boyfriends.  The acts of abuse include being raped, beaten with objects, threatened with weapons, or abandoned in remote locations).  An investigation into the mortality rate of women in prostitution revealed that the leading cause of death was homicide, and found that actively prostituting women were nearly 18 times more likely to be murdered than women of similar age and race.  *See* Potterat, J., Brewer, D., Muth, S., Rothenberg, R., Woodhouse, D., Muth, J. et al. (2004). *Mortality in a long-term open cohort of prostitute women*. American Journal of Epidemiology, 159(8), 778-785. Furthermore, studies have also demonstrated that a high percentage of individuals who are involved in commercial sex work want to stop prostituting, but feel that they are trapped. *See* Farley, M. and Barkan, H. (1998). *Prostitution, violence against women, and posttraumatic stress disorder*. Women & Health, 27(3), 37-49.

Congress clearly recognized the serious nature of the Defendant's criminal offenses when enacting a 10 year statutory maximum for violations of Title 18 U.S.C. § 2421(a). As such, this factor clearly weighs in favor of detention.

### B. The Weight of the Evidence Against the Defendant

As summarized above, the evidence against the Defendant is extremely strong.  The Defendant is on audio tape and chats recruiting the undercover to work for him on the streets of New York performing commercial sex acts during a pandemic, COVID-19, with strangers for his sole benefit.  He was looking to capitalize on the dire financial situation that many women and girls find themselves in at this time.

As detailed above, the text messages with the undercover demonstrate the nature and persistence of the Defendant's efforts to persuade and coerce a victim and a friend into traveling from D.C. to New York with him to engage in prostitution. He drove over four hours to make it happen. Therefore, the weight of the evidence strongly favors detention.

### C. The History and Characteristics of the Defendant

The Defendant's history and characteristics weigh heavily in favor of detention. He is unemployed. He resides in New Jersey, with family. His only ties to the District of Columbia seem to be his desire to utilize the city for his illegal activities by gathering victims for his enterprise. The Defendant also has a history of weapons possession, drug possession, and a lengthy history with the criminal justice system.

According to the Pretrial Services Report ("PSR"), filed with the Court on September 4, 2020, the Defendant has 9 prior arrests, resulting in 5 prior convictions. PSR at 1. He has 2 felon in possession gun convictions from 2006 and 2003. Id. at 3-4. The Defendant has a string of misdemeanor offenses, including drug possession and petit larceny. Id. at 4.

Notably, the Defendant after so many felonies is deemed to be a recidivist repeatedly violation the law resulting in several felony charges. Additionally, the defendant told the Court on September 4, 2020 that he is not gainfully employed. Thus, it is clear from the text messages and his criminal history that his primary income is generated by trafficking in women and girls.

### D. The Nature and Seriousness of the Danger to Any Person or the Community

The evidence here establishes that the defendant represents a grave danger to the community. As stated above, the Defendant poses a danger to the community, at large, as the result of his ongoing course of criminal conduct. As a result of the criminal actions of the Defendant, and the Defendant's lengthy criminal history, which includes several gun possession, the Defendant's

13

release would pose a serious risk of harm to members of the community. As such, he should be detained pending trial.

### I. While the COVID-19 pandemic is dangerous, it does not rebut the presumption of detention, nor mitigate the danger to the community

The government respectfully submits that should defense counsel raise concerns regarding the COVID-19 pandemic, such concerns neither rebut the presumption of detention nor mitigate the dangers discussed above. To be clear, the government does not downplay the risks associated with COVID-19, but the existence of the virus in and of itself does not trigger automatic release under these circumstances. Rather, the Court is still required to assess the defendant's particularized factors in determining whether to release him. *See United States v. Lee*, 19-cr-298, at *9 (KBJ) (D.D.C. March 30, 2020) ("[T]he relevant statutory inquiry is *not* the benefits that a defendant's release would bring about (however significant) or the harms that his incarceration would cause (however substantial). Rather, the statute requires the Court to evaluate "*the danger*" that "*would be posed by the person's release*."). Thus, the COVID-19 pandemic has no material impact on any of the factors that the magistrate court previously considered and there is no additional basis to reopen that detention decision pursuant to 18 U.S.C. § 3142(f). *United States v. Gaskins*, 20-cr-23 (RDM) (D.D.C. April 2, 2020) (noting that the defendant in a firearms case is not particularly vulnerable, and the existence of the pandemic does not eliminate the prior 3142 factors taken into consideration).

Section 3142(i) operates independently of the detention factors. Therefore, the Court could release a defendant temporarily to the custody of another if it finds a "compelling reason" that necessitates temporary release. Respectfully, the existence of the pandemic in and of itself is not a compelling reason to justify release. *See United States v. White,* 19-mj-00203(DAR) (D.D.C.

April 2, 2020). Moreover, according to the D.C. Department of Corrections (DOC), DOC appears to be have undertaken several steps to try to prevent the spread of COVID-19 within its facilities. In fact, recent evidence suggests these efforts have been successful. As of August 13, 2020, the D.C. Jail reported the following:

> Presently, there are 908 residents at the District of Columbia Department of Corrections' (DOC) Central Detention Facility, 416 residents at DOC's Correctional Treatment Facility, 2 residents at local hospitals, and 1 resident at a halfway house. No residents tested positive for COVID-19 today, August 13, 2020. Currently, there is one positive COVID-19 case at DOC's correctional facilities.

Therefore, for all of these reasons, the Defendant should remain detained pending trial.

## **CONCLUSION**

For all of the reasons set forth above, a consideration of the evidence in this case and the applicable statutory factors compels the conclusion that the Defendant should be detained pending trial. Given the plans in place at the DOC and the danger that the defendant represents to the community – the same community also affected by this illness, this Court should detain the defendant pending trial.

Respectfully submitted,

MICHAEL SHERWIN
UNITED STATES ATTORNEY

___/s/_____

Kenya K. Davis
Assistant United States Attorney
New York Bar No. 4108221
U.S. Attorney's Office
555 4th Street, N.W.,
Washington, D.C. 20530
202-252-7059
Kenya.Davis@usdoj.gov